UNITED STATES DISTRICT COURT
DISTRICT OF MAINE

| | |
|---|---|
| RASHAUN JONES, | ) |
| | ) |
| Movant, | ) |
| | ) |
| v. | ) |
| | ) Crim. No. 05-84-P-S |
| UNITED STATES OF AMERICA, | ) Civ. No. 09-202 -P-S |
| | ) |
| Respondent | ) |

**RECOMMENDED DECISION ON 28 U.S.C. § 2255 MOTION**

Pending is Rashaun Jones's 28 U.S.C. § 2255 motion challenging his conviction for drug conspiracy. Gauging by his § 2255 motion, his supplementation, and reply to the United States' motion for summary dismissal, Jones's principal complaint is that the voice on a tape obtained by law enforcement through the use of a confidential informant was not his voice.[1] Jones frames this as an ineffective assistance ground. In his second Section 2255 claim Jones faults his trial and appellate counsel for not challenging the warrantless search of the hotel room on the grounds that this search went beyond plain view when the investigating officers found a rice box containing drugs in a kitchen cabinet. Jones does not revisit this second ground in his subsequent pleadings. I recommend that the Court deny Jones 28 U.S.C. § 2255 relief.

*Discussion*

The First Circuit has explained with respect to the <u>Strickland v. Washington</u>, 466 U.S. 668 (1984) Sixth Amendment standard:

> The Sixth Amendment to the United States Constitution guarantees that "[i]n all criminal prosecutions, the accused shall enjoy the right ... to have the

---
[1] (Sec. 2255 Mot. at 4; <u>id.</u> Ex. A at 1; Sec. 2255 Mem. at 1-2;Jones Aff. At 1; Sec. 2255 Suppl. at 1; Reply Mem. at 1-7.)

> Assistance of Counsel for his defence." It is well settled that this right to effective assistance of counsel attaches at all critical stages of the trial, United States v. Wade, 388 U.S. 218 (1967), including at sentencing. Gardner v. Florida, 430 U.S. 349, 358 (1977) (holding that "sentencing is a critical stage of the criminal proceeding at which [defendant] is entitled to the effective assistance of counsel").
> The touchstone for any ineffective assistance of counsel claim is the two-part test laid down by the Supreme Court in Strickland v. Washington, 466 U.S. 668(1984).
>> First, the defendant must show that counsel's performance was deficient. This requires showing that counsel made errors so serious that counsel was not functioning as the "counsel" guaranteed the defendant by the Sixth Amendment. Second, the defendant must show that the deficient performance prejudiced the defense. This requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable.
>
> Id. at 687. In other words, defendant "must show that counsel's performance was so deficient that it prejudiced his defense." United States v. Ademaj, 170 F.3d 58, 64 (1st Cir.1999) (summarizing Strickland ). As the Strickland Court explained, "[u]nless a defendant makes both showings, it cannot be said that the conviction or death sentence resulted from a breakdown in the adversary process that renders the result unreliable." Strickland, 466 U.S. at 687.

United States v. Colon-Torres, 382 F.3d 76, 85 -86 (1st Cir. 2004). As Strickland noted, "strategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable." 466 U.S. at 690.

### *Failure to Challenge Identification of Voice on Tape*

Jones's argument with regards to his primary 28 U.S.C. § 2255 challenge is that he "repeatedly asked his trial attorney to contest the taped phone conversation as to the validity of the tape. Jones insists that the voice on the tape was not his own. This ineffectiveness was prejudicial to Jones since the only evidence tying Jones to the crime was the tape." (Sec. 2255 Mem. at 1, Doc. No. 1-2.) In his supplement to this § 2255 motion Jones asserts that he was not able to confront the witnesses against him. Specifically he explains: "Nick Foster testified to the tape at trial, but John Thomas was the one to make the phone call, and Thomas did not testify

2

to it at trial because Thomas knew it was not Jones on the tape. So again, Jones'[s] lawyer was <u>ineffective</u> for not challenging the tape on account that [J]ohn Thomas was not the one to testify." (Sec. 2255 Supplemental Mem. at 1, Doc. No. 14.)

As Jones argues, the testimony regarding the voice on the tape was a little sketchy to the extent that it relied on Nicholas Foster, a cooperating witness who was involved with the conduct in question. Foster was asked questions concerning this taped conversation during Jones's trial. On cross-examination by defense counsel the following exchange took place:

> Q. I want to talk a little bit about the recording that [the prosecutor] played for you. You said the voices on the tape belong to Johnny and the defendant, right?
> A. Yes.
> Q. And are you sure other than Johnny's voice on the tape that the other voice does not belong to a gentleman named Yaz?[2]
> A. I'm fairly certain it belongs to him.
> Q. How many times have you listened to the tape?
> A. Today is the third.
> Q. When did you listen to the tape on other occasions?
> A. The first time I believe a week after my arrest during a proffer, the second time was trial preparation on Monday.

(Trial Tr. at 175.) After he requested and received a bathroom break on cross-examination, Foster immediately asked the court if he could clarify something even though there was no question pending. (Trial Tr. at 178-79.) Foster then explained: "You had asked if the voice on the tape could have been Yaz, they were talking about heroin. And only the cocaine came from the Dominicans, so I would say no, it was not Yaz. I assume he was black. Because they were talking about heroin." (<u>Id.</u> at 179.) This is the portion of the trial transcript that Jones underscores (<u>see</u> Doc. No. 1-1 at 1) when making his argument that there was a reason to challenge the voice identification. Jones protests: "The only verification of the voice was by

---

[2] The first reference to Yaz at trial was by Foster on direct examination in which he indicated: "There was somebody down in New York/New Jersey named Yaz, somebody to that effect. I really don't know. That is about the extent of my knowledge of anything of what was going on in New York." (Trial Tr. at 140.)

3

Mr. Foster who never made the phone call and who believed [the voice on the tape] had to be Jones since Jones is black and only blacks sell heroin." (Reply Mem. at 7.)

The trial transcript also contains the following testimony by the law enforcement agent about the taped conversation here at issue:

> Q. Special Agent Buchanan, I'm handing you what has been marked for identification as Exhibit 7A and 7B. What is 7A?
> A. 7A is a cassette tape recording, a copy of the recording of a conversation between John Thomas and the defendant on September 19, 2005.
> Q. And what is 7B?
> A. 7B is a transcript of the recording on the cassette tape.
> Q. Have you reviewed the transcript with the audio recording on Exhibit 7A?
> A. Yes, I have.
> Q. To the best of your ability is the transcript a fair and accurate translation of the call recorded on September 19?
> A. Yes.
> Q. Is it two calls actually?
> A. Two calls, yes.
> [PROSECUTOR]: Your Honor, at this time the government will move 7A, the cassette into evidence.
> THE COURT: Any objection?
> [DEFENSE COUNSEL]: I object at this time to the foundation that has been laid to this particular point. I believe the rest of it should be done through another witness.
> THE COURT: What is the problem with the foundation?
> [DEFENSE COUNSEL]: Actually I will withdraw my objection to the identity of the people on the tape.
> THE COURT: Objection is withdrawn. In the absence of an objection, Government Exhibit 7A is admitted.
> [PROSECUTOR] : At this time, your Honor, the parties have stipulated a copy of 7A is on the laptop and I will play the call from a laptop at the table here in court.
> THE COURT: Is that so stipulated?
> [DEFENSE COUNSEL]: It is so stipulated.
> THE COURT: You may proceed.
> [PROSECUTOR]: I'm sorry, your Honor, I have extra copies of the transcript and I would request an instruction as to the proper use of the transcript.
> THE COURT: Come to sidebar.
> (Bench conference as follows:)
> THE COURT: Is there a problem with this recording?
> [DEFENSE COUNSEL]: My understanding is a transcript is used as an aide and it is hard to hear the call. My objection is that it's clearly hearsay evidence, it involves interpretation by somebody not available for cross.

4

[PROSECUTOR]: I would ask the Court to issue a general instruction so that the jury would just use this as an aide.
[DEFENSE COUNSEL]: Your Honor, I have listened to a copy of the tape which was provided and I compared it with the transcript. As far as you can hear on the tape, the transcript is accurate. If the Court is willing to let the government use it, from the discussions we've had, it would be used as an aide and it is not to be admitted.
THE COURT: If it is so agreed, I will permit it. How much interpretation is there involved?
[PROSECUTOR] : As I said, it's hard to hear and it's better off the laptop than the audio cassette. We have all reviewed the accuracy of the transcript and it's to be used as an aide. Only the tape should go into evidence.
THE COURT: Okay. May I have this one?
MS. BUNKER: Absolutely.
 (End of bench conference.)
THE COURT: Ladies and gentlemen of the jury, I want to explain to you what happened here. This is an audio tape that has been made on a disc to be played off a computer. Counsel have agreed the tape of the conversation that is on the tape and on the disc can be played to you so you can hear it, and as an aide to you in case you have trouble hearing the conversation played back to you in the courtroom. Madam clerk is passing out to you a transcript which counsel have reviewed and have agreed it is a fair and accurate representation of what appears on the tape.
…
　　　　I wanted to say, some of you have read the transcript  …this is only an aide to  you in hearing and understanding what is to be heard from a recording. The transcript itself is not evidence, you are to rely principally on what you hear from the recording itself and this is an attempt to make it easier. Any objection to the instructions?
[PROSECUTOR] : No your Honor.
[DEFENSE COUNSEL]: No your Honor.
THE COURT: Proceed.
Q. Special Agent Buchanan, let me just clarify that you are the one who actually recorded this call, correct?
A. Yes.
Q. And you were present with John Thomas when he made the call?
A. Yes, I was. (Tape played).
Q. Agent Buchanan, do you recognize one of the voices, at least one of the voices in that recorded call?
A. Yes.
Q. Which one?
A. The voice of John Thomas or on the transcript JT.
Q. And do you know whether a subsequent drug transaction either controlled or otherwise happened between John Thomas and this person on the other end of the line on the following Thursday?

A. No. One did not happen.
Q. Why not?
A. Mr. Thomas was in custody and the defendant or the other individual on this recording was out of town.
Q. And, you testified in reference to the tape recording of this particular conversation that you recognized Mr. Thomas' voice on the tape, right?
A. Yes.
Q. And, actually there is also another voice you recognized on the tape, right?
A. My voice, yes.
Q. So that you are sort of, for lack of a better word, the third voice heard on the tape?
A. Yes, in addition to, I think there is a computerized voice, a male voice.
Q. Right. So it's you who at the end of that tape-- describe what you said at the end of that recording?
A. I think I said something to the effect, you didn't talk about crack, after the conversation.
Q. And why did you say that to Mr. Thomas?
A. Well on these phone calls we like to get as much specifics as we can during the call without compromising what we are attempting to do, or the investigation. So it was after the phone was hung up, it was my comment to John Thomas, prior to I kind of told him what I would like for him to say but at the same time I instructed him not to say anything he would not normally say.
Q. Let's talk a little more about instructions you gave to Mr. Thomas beforehand. Were you the only agent with Mr. Thomas at the time this was occurring?
A. No. No.
Q. Who was there?
A. I was accompanied by Task Force Agent Gregory Boucher.
Q. And can you describe specifically how you instructed Mr. Thomas to make the call?
A. Yeah, to the best of my recollection it was, you know, call Rashaun Jones, which is what Mr. Thomas called him, and tell him that you are out of what you had and you needed more. And I also instructed him to be as specific as he could when talking about the drugs and not to be any different than he normally would be, and try not to say anything he normally would not say.
Q. And obviously, as you said, you do that because you want the tape to be as specific as possible, right?
A. Yes.
Q. Because the recordings are usually good evidence in cases like this?
A. They can be, yes.

(Trial Tr. at 100-115.)

The United States has provided a copy of the transcript that was used to assist the jury. With respect to the first call on September 19, 2005, placed by Thomas, the following exchange took place:

> JONES: Hello?
> THOMAS: Yo so what's good yo?
> JONES: What's wrong?
> THOMAS: What you do –
> JONES: I'll call you right back?
> THOMAS: Oh. He know…

(Transcript at 2, Gov't Ex. B, Doc. No. 21-2.)[3] The second call went as follows:

> JONES: Hey, what you want me to do man [unintelligible]?
> THOMAS: Yo, [unintelligible] sounds good hu?
> JONES: What, what's up?
> THOMAS: What you doin', man?
> JONES: Nothin'
> THOMAS: Yo, I be done, by like Thursday. Yo.
> JONES: Work? Why? He came back?
> THOMAS: Yeah.
> JONES: Already?
> THOMAS: Yeah. She's jumpin'.
> JONES: From before?
> THOMAS: Yeah … but I got a little bit left.
> JONES: All right.
> THOMAS: I got like four … I got like four pieces left.
> JONES: All right.
> THOMAS: All right?
> JONES: Uh hm.
> THOMAS: All right.
> JONES: I'm gonna be up there on Thursday [unintelligible].
> THOMAS: Thursday?
> JONES: Yeah. [unintelligible] I swear she did.
> THOMAS: (Chuckling). All right.
> JONES: You know, this, this is crazy. All right.
> THOMAS: All right.
> (End of phone call.)
> SPECIAL AGENT BUCHANAN: You didn't talk about crack.

---

[3] I have made non-substantive changes to the transcript to dispense with the initials.

7

(Id. at 3-4.) During her closing argument defense counsel stressed:

> The phone call you heard, the phone call was made by John Thomas. Agent Buchanan testified to that. Agent Buchanan said he was the one there to make sure the recording equipment was working. He does not know what phone number was dialed. He did not recognize the voice on the other end. The only person that suggests to you that the voice on the other end of the telephone belongs to Jones is Nick Foster.
> Ladies and gentlemen, when you go back in the jury room and listen to the tape yourself and find out and figure out amongst yourselves what that tape actually means, and what the words actual mean[], they could have been talking about a number of things - clubs, women, or what have you.
> Based on the credibility of Nick Foster, which you have to judge for yourselves, maybe it's not Mr. Jones on the other end.

(Trial Tr. at 403-04.)

From my reading of the trial transcript and the overall substance of the United States' evidence against Jones, counsel's decision to not more aggressively challenge what is a pretty vague conversation was well within the permissible bounds of Strickland's articulation of acceptable performance given the deference that must be accorded a trial attorney's tactical choices. 466 U.S. at 690; see also Phoenix V. Matesanz, 233 F.3d 77, 83 (1st Cir. 2000). Defense counsel did attempt to throw some doubt on Foster's identification and Foster's post-bathroom break "clarification" was gratuitous and certainly nothing for which Jones's counsel can be held responsible for eliciting. While Thomas was not called to verify his part in the conversation during trial, counsel likely had good reason for avoiding his testimony. As this Court is well aware, Jones's counsel strenuously sought a severance of the trials of Jones and Thomas and this court orally granted that motion on May 30, 2006. (See Tr. May 30, 2006, Chambers Conference, Doc. No. 119.) With respect to Thomas, he had pled guilty to one count of his indictment prior to Jones's trial and the United States was holding out on dismissing the other three counts against him until after Jones's trial. (Id.) Jones suggests that Thomas was not

called as a witness apropos the voice identification by the United States because he "knew it was not Jones on the tape." (Sec. 2255 Supp. at 1.) However, there is no evidence before me that Thomas would have so testified at Jones's trial; all there is is Jones's affidavit statement that it was not his voice on the tape (Jones Aff. ¶ 1, Doc. No. 1-3). There is no reason to convene an evidentiary hearing to have Jones testify to this; even fully crediting this statement it would be insufficient to warrant 28 U.S.C. § 2255 relief on ineffective assistance of counsel grounds.

*Counsels' performance vis-à-vis the Arrest and Search*

With regards to Jones's challenge to trial and appellate attorneys' performance vis-à-vis the arrest and search, he is quite off the mark in faulting counsel for not mounting such an attack. This was one of three primary arguments raised by trial counsel in the motion to suppress. See United States v. Jones, Crim. No. 05-84, 2006 WL 763124, 12 (D. Me. Mar. 24, 2006) (recommended decision), adopted, 2006 WL 1071893 (Apr. 21, 2006). What is more, appellate counsel continued to press the point in front of the First Circuit. The Panel explained and concluded:

> Jones claims that any valid consent he may have given was confined to the bedroom in which he had been placed, and did not extend to the kitchenette or the other rooms of the hotel suite. A search justified by consent will be deemed reasonable as long as it does not exceed the scope of the consent given. See United States v. Turner, 169 F.3d 84, 87 (1st Cir.1999). When determining the scope of consent, we apply a test of objective reasonableness: " '[W]hat would the typical reasonable person have understood by the exchange between the officer and the subject?' United States v. Meléndez, 301 F.3d 27, 32 (1st Cir.2002) (quoting Florida v. Jimeno, 500 U.S. 248, 251 (1991)). . . .
>
> As such, the district court did not err in concluding that Jones's consent extended to the entire suite, and it was not unreasonable for Agent Boucher and the other officers to conduct a search of the other rooms for drugs, including the kitchen cabinet. Cf. Meléndez, 301 F.3d at 33 (dismantling and looking inside a speaker did not exceed the scope of consent to search a room, as "[t]he speaker was located in the area that [the consenting party] had allowed the officers to search, and was a place in which the officers could have reasonably suspected

>drugs to be hidden"). Having dismissed Jones's challenge to his consent to search, we turn to his third and final assignment of error with respect to the denial of his suppression motion.
>…
>Jones argues that Marshal Cooper's search of the kitchen cabinet, and consequent discovery of drugs therein, was not justified as a protective sweep or under any other exception to the warrant requirement. The district court examined the timeline as established through the testimony of the various officers at the suppression hearing, and found that the Government had established by a preponderance of the evidence that Marshal Cooper actually discovered the drugs in the kitchen cabinet after Jones had given his consent to Agent Boucher. We have reviewed the officers' testimony and conclude that this finding was not clearly erroneous.We briefly explain.
>
>…. Because Marshal Cooper's search of the kitchen cabinet occurred after Jones gave consent and-as affirmed above-the scope of the consent extended to the kitchen cabinet, it was constitutionally valid. Given this conclusion, we need not state a view on the district court's alternative ruling that the search was lawful in any event by virtue of the "independent source" doctrine.

United States v. Jones, 523 F.3d 31, 38 -40 (1st Cir. 2008) (footnotes omitted).   So even if the magistrate judge, the district court judge, and the three members of the First Circuit Panel were completely wrong in reaching their conclusion, there is no basis for faulting Jones's counsel for inadequately pressing his argument that the search of the kitchen cabinet was impermissible under the Fourth Amendment of the United States Constitution.   Clearly the argument has been made and rejected at both the trial and appellate levels.

## Conclusion

For the reasons stated above, I recommend that the Court deny Jones 28 U.S.C. § 2255 relief.  I further recommend that a certificate of appealability should not issue in the event Jones files a notice of appeal because there is no substantial showing of the denial of a constitutional right within the meaning of 28 U.S.C. § 2253(c)(2).

NOTICE

A party may file objections to those specified portions of a magistrate judge's report or proposed findings or recommended decisions entered pursuant to 28 U.S.C. § 636(b)(1)(B) for which *de novo* review by the district court is sought, together with a supporting memorandum, within fourteen (14) days of being served with a copy thereof.  A responsive memorandum shall be filed within fourteen (14) days after the filing of the objection.

Failure to file a timely objection shall constitute a waiver of the right to *de novo* review by the district court and to appeal the district court's order.

/s/ Margaret J. Kravchuk
U.S. Magistrate Judge

May 10, 2010.